# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 25, 2025

Lyle W. Cayce
Clerk

———————

No. 24-60447

———————

Ryan C. Rose,

*Plaintiff—Appellant*,

*versus*

Nissan North America, Incorporated,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:23-CV-57

———————————————————————

Before Higginson, Ho, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

Electrical technician Ryan Rose brought this personal injury suit against Nissan North America, Inc. (Nissan) after suffering a serious electric shock while working for Automated Power, Inc., at Nissan's plant in Canton, Mississippi. Under Mississippi law, a premises owner cannot be held "liable for the death or injury of an independent contractor or the independent contractor's employees resulting from dangers of which the contractor knew or reasonably should have known." Miss. Code Ann. § 11-1-66. Finding no genuine dispute that Automated Power was Nissan's independent

contractor and knew of the danger that resulted in Rose's injury, we affirm the district court's grant of summary judgment to Nissan.

## I.

In March 2022, an electrical fault caused electrical equipment damage and a partial power outage at Nissan's car manufacturing plant in Canton, Mississippi. Soon thereafter, Nissan hired Automated Power, an electrical engineering firm that specializes in "industrial power projects," to repair the damaged equipment.[1] Among the Automated Power employees sent to perform the work was technician Ryan Rose. Rose's subsequent electric shock injury in the plant's "A-B tiebreaker cubicle" forms the basis of this lawsuit.

Resolving this appeal requires some understanding of the plant's electrical system. The plant's main energy substation is divided into three sections—labeled A, B, and C—that are fed by different transformers and that consist of structures called "cubicles" or "cabinets." Each section's power feed connects to a "bus" within a cubicle. The different sections' buses are connected to each other via "tiebreakers" (e.g., the A-B tiebreaker connects the A-bus to the B-bus), and the tiebreakers have their own cubicles. When the power supply to one bus goes down, "closing" a tiebreaker connected to that bus allows electricity to flow to it from an energized bus. Importantly for this case, when power is not being supplied to a bus, the cubicle of a tiebreaker connecting that de-energized bus to an energized bus is still energized on the side of the energized bus. Rose and Automated Power were both aware of that fact at the time of Rose's injury.

---

[1] Rose states, and Nissan does not dispute, that "Automated Power and Nissan did not have a contract."

No. 24-60447

The plant's March 2022 electrical fault occurred in or near the A-B tiebreaker cubicle. On April 6, 2022, the day Rose was injured, the B-bus was energized, but the A-bus was de-energized to allow Rose and a co-worker to clean and, if necessary, remove and replace A-side "bus bars" safely. Rose asserts that "red Xs were taped onto cubicle doors to establish a line of demarcation between the A bus cubicles . . . that were de-energized and safe to work on, and the B bus cubicles . . . that were energized and not safe to work on."[2] Rose contends that: The taping scheme indicated that the A-B tiebreaker cubicle was de-energized, the cubicle's door was unlocked, no one told Rose to stay out of the cubicle, and Nissan's project manager knew that Rose was working inside the cubicle. According to Rose, as Automated Power employees worked at the plant, Nissan's project manager "was on-site daily and made decisions on Nissan's behalf."

Given the risks of working on electrical equipment, Automated Power instructs its employees to check system components with insulated, voltage-detecting rods called "hot sticks" before working on those components. During his deposition, Rose testified that neither he nor anyone else used a hot stick to check for energized components in the A-B tiebreaker cubicle on the day of his injury and conceded that he would not have been injured had he done so. But another Automated Power employee stated that he and a co-worker checked "every section on the feeder A side"[3] with hot sticks on the morning of the incident. And the Automated Power employee with whom Rose worked in tandem on that day testified that he and Rose did not use hot sticks to "test the inside of the lower A/B tie breaker cabinet because all cabinets had been tested that morning."

_____

[2] The parties dispute whether Nissan or the utility company taped the doors.

[3] Rose asserts that this included the A-B tiebreaker cubicle.

Rose sustained a serious electric shock when he "traced the damaged de-energized bus bar from the outside of the lower A-B tie breaker cubicle . . . to the inside of the same . . . cubicle and entered [it] . . . to remove the bolts" holding the bus bar in place. Rose has allegedly incurred nearly $700,000 in medical expenses.[4]

In January 2023, Rose sued Nissan, alleging failure to provide a safe workplace, failure to warn, and general negligence. In February 2024, Nissan moved for summary judgment, arguing that it was "immune from liability under both Mississippi statutory and common law." The district court granted Nissan's motion and entered final judgment for Nissan "because Rose was Automated Power's employee, Automated Power was an independent contractor, and Automated Power and Rose 'reasonably should have known' of the dangers resulting in his injury." (Quoting MISS. CODE ANN. § 11-1-66).

## II.

"We review grants of summary judgment *de novo*, applying the same standard as the district court." *N. Am. Sav. Bank, F.S.B. v. Nelson*, 103 F.4th 1088, 1094 (5th Cir. 2024) (quoting *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We draw all reasonable inferences and resolve any doubts in favor of the nonmoving party. *Nelson*, 103 F.4th at 1094. "A 'dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

---

[4] Automated Power and its workers' compensation carrier, Liberty Mutual Insurance Company, both represent that Rose has received workers' compensation benefits as a result of his injury.

nonmoving party.'" *Id.* (quoting *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)).

"Sitting in diversity, we apply the substantive law of the forum state, here, Mississippi." *Id.* "A district court's determination of state law is reviewed *de novo*." *Id.* "We distill state law by looking to the decisions of the state's highest court." *Id.* "But when no case law from the state's supreme court is on offer, we may look to decisions of the intermediate appellate court, barring a reason to think the state supreme court would decide otherwise." *Id.*

## III.

Mississippi Code § 11-1-66 provides: "No owner, occupant, lessee or managing agent of property shall be liable for the death or injury of an independent contractor or the independent contractor's employees resulting from dangers of which the contractor knew or reasonably should have known." The Mississippi Supreme Court defines an independent contractor as "a person who contracts with another to do something for him but who is not controlled by the other nor is subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Heirs & Wrongful Death Beneficiaries of Branning ex rel. Tucker v. Hinds Cmty. Coll. Dist.*, 743 So. 2d 311, 316 (Miss. 1999). A premises owner invoking § 11-1-66 has the burden of proving that the statute applies, i.e., that the injured party either was, or worked for, an independent contractor that "knew or reasonably should have known of the danger that caused his injury." *Tanner v. Roseburg Forest Prods. S., Ltd. P'ship*, 185 So. 3d 1062, 1064 (Miss. Ct. App. 2016).

Rose's primary argument on appeal is that "Nissan's substantial control over access" to the A-B tiebreaker cubicle "voided Automated Power's independent contractor status, resurrected Nissan's common law

duty to Rose as a business invitee, and took this case out of the [purview of § 11-1-66]." That status distinction matters because if Automated Power was not an independent contractor and Rose was Nissan's business invitee, we would look only to Rose's knowledge of the danger involved. *See Jones v. James Reeves Contractors, Inc.*, 701 So. 2d 774, 782 (Miss. 1997). But if Automated Power was Nissan's independent contractor, Automated Power's knowledge drives the inquiry because, as Rose concedes, under the plain language of § 11-1-66, "Automated Power's knowledge of the danger [can] be imputed to him" if the statute applies. *See* Miss. Code Ann. § 11-1-66 (centering the inquiry on "dangers of which *the contractor* knew or reasonably should have known") (emphasis added).[5] Nissan answers Rose's argument by asserting that § 11-1-66 "precludes any question of 'control' with respect to dangers inherent in the work or that otherwise reasonably should have been known to the contractor or its employees." In Nissan's view, Rose is trying to "bring a 'control' test back into play through a side door, by arguing that the 'independent contractor element' of the statute somehow separately incorporates a 'control' test of some sort."

The Mississippi Supreme Court has cited § 11-1-66 in only two opinions, neither of which touches on this issue. *See White v. Targa Downstream, LLC*, 358 So. 3d 627 (Miss. 2023); *Peak v. Cohee*, 294 So. 3d 604 (Miss. 2020). But the Mississippi Court of Appeals has "[found] section 11-1-66 . . . applicable" after concluding that a company was an independent contractor because the premises owner did not "retain[] control such as to

---

[5] In *Tanner*, the Mississippi Court of Appeals' § 11-1-66 analysis focused on the knowledge of the independent contractor's employee rather than the knowledge of the independent contractor itself. 185 So. 3d at 1064–65. But the *Tanner* court also referred to the employee himself as being an independent contractor. *See id.* at 1065; *cf. Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1276 n.9 (Miss. 2007) (noting that under Mississippi law, "[a]n employee's knowledge is imputed to his employer").

void [the company's] status as an independent contractor." *McSwain v. Sys. Energy Res., Inc.*, 97 So. 3d 102, 106–09 (Miss. Ct. App. 2012). Taking our cue from Mississippi's intermediate appellate court, we briefly consider whether "[Nissan] retained control such as to void [Automated Power's] status as an independent contractor." *Id.* at 107.

The Mississippi Supreme Court has laid down a ten-factor test for determining whether an individual or entity is an independent contractor. *Id.* at 106–07 (quoting *Heirs*, 743 So. 2d at 316–17); *see also Gilchrist v. Veach*, 754 So. 2d 1172, 1174 (Miss. 2000) (Smith, J., concurring in part and dissenting in part) ("The factors are not exclusive, and no one factor is conclusive."); *Walker v. McClendon Carpet Serv., Inc.*, 952 So. 2d 1008, 1010 (Miss. Ct. App. 2006) (stating that the ten factors "are merely a few tests that help guide the court in determining the nature of the relationship"). One of the ten factors addresses who has "control of the premises." *McSwain*, 97 So. 3d at 106 (citation omitted). Two others concern who has the right to (1) "prescribe and furnish the details of the kind and character of the work to be done" and (2) "direct the details of the manner in which the work is to be done." *Id.* (citation omitted).

Rose does not dispute that he performed his work at the Nissan plant "according to Automated Power's instructions," or that Automated Power had "control over the technique and the procedures for performing the repairs." "[Rose] was a regular employee of [Automated Power] and was only assigned to work at [the Nissan plant] temporarily"; likewise, the record indicates that Automated Power "assumed full responsibility for the conditions pertaining to the work, including hiring, paying, and training employees, as well as the details and methods of the work." *McSwain*, 97 So. 3d at 107. Simply put, Nissan "did not control how the . . . work was done." *Heirs*, 743 So. 2d at 318. Thus, Rose's argument that Automated Power was not Nissan's independent contractor is solely based on his assertion that

"Nissan Project Manager Jason Adams had the exclusive authority to control [Rose's] access to the A-B tiebreaker cabinet." But Rose cites no authority supporting the proposition that a premises owner's control over *access* to equipment on its property necessarily renders a third-party employer of on-site workers something other than an independent contractor. Understandably so, because, as Nissan notes, "an owner *always* retains control at some level over activities on its premises." So Rose's argument that Automated Power was not Nissan's independent contractor is untenable.

With that conclusion, what remains of Rose's argument collapses. Rose focuses entirely on whether *he* knew or should have known of the danger involved, i.e., that the A-B tiebreaker cubicle could be energized. But Automated Power's knowledge also matters, and we have little trouble concluding that Rose's "injury . . . result[ed] from dangers of which [Automated Power] knew or reasonably should have known." Miss. Code Ann. § 11-1-66. Mac Marsh, the president and owner of Automated Power, testified that, on the day Rose was injured, Rose violated company policy by, *inter alia*, not "us[ing] the hot stick to check for the presence of energized voltages" before entering the A-B tiebreaker cubicle. Marsh also testified that Automated Power had instructed its employees: "Before you enter a cubicle, you test it. Doesn't matter who tested it before you. You test it, too." Marsh also testified that multiple Automated Power employees knew the B-bus was energized when Rose entered the A-B tiebreaker cubicle, and Rose "does not dispute that he was aware" of the same. Finally, Automated Power knew that components in a tiebreaker cubicle can be energized even if a bus on one side of the cubicle is de-energized.

On these facts, there is no genuine dispute that Nissan's independent contractor Automated Power knew that entering the A-B tiebreaker cubicle

No. 24-60447

presented a danger of electrical injury. Section 11-1-66 therefore shields Nissan from liability in this suit. The judgment of the district court is

AFFIRMED.